# JOSEPH WILLNER *vs.* HARRIS SILVERMAN, et al.

*Blacklisting of Employee—Interference with Another's Business—False Statement Concerning Discharged Workman—Actionable Wrong—Evidence—Letter Written by Unauthorized Employee of Firm.*

One who requests other persons not to give employment to plaintiff, a workman he had discharged, and in doing so makes untrue statements concerning the plaintiff and expresses a desire to make an example of him, is liable in an action for the injury shown to have been thereby caused to plaintiff.

When defendant wrote a letter notifying the members of an association, consisting of persons in the same trade, that he had discharged the plaintiff from his service and requested them not to give him employment, and the plaintiff is subsequently refused employment by the members of the association, that is evidence that this refusal resulted from the writing of the letter.

In an action against three persons, individually and as a firm, alleging that they had injured the plaintiff by sending a letter containing false statements concerning him and requesting the members of a trade association to which defendants belonged not to employ plaintiff, the evidence showed that the letter was written by M., one of the defendants, without the knowledge of the others; that M. was an employee not authorized to write such letters; that the writing of this letter was not previously authorized or subsequently ratified by the other defendants, and that the firm was not formed until after the injury complained of. *Held,* that the plaintiff's right of action is against M. only.

When all of the facts in regard to the sending out of a letter have been proved, a witness cannot be asked for his opinion as to circumstances attending the issue of the letter.

In an action to recover damages for having been unjustifiably blacklisted, which prevented him from obtaining employment, the plaintiff cannot be asked: "What reason, if any, was given by the various people to whom you applied, for their refusal to employ you."

When one, after talking over the telephone with a person at a distance, repeats what that person said to the witness, then present with him during the conversation, the witness cannot testify as to what was so repeated to him, since it is hearsay.

*Decided January 12th, 1909.*

Appeal from the Superior Court of Baltimore City (EL-LIOTT, J.).

The cause was argued before BOYD, C. J., BRISCOE, PEARCE, SCHMUCKER, BURKE, THOMAS and HENRY, JJ.

*John Prentiss Poe* and *Thomas Mackenzie,* for the appellant.

The fifth exception arises upon the refusal of the Court to allow the plaintiff to testify as to the reasons for not employing him given by the various persons to whom he applied for work. Here was a laboring man endeavoring to procure employment after he had been summarily discharged by his last employer, and he learns while searching for work and meeting with rebuffs that he had been *blacklisted,* and that all the members of the Clothiers' Board of Trade are banded together not to employ any workman discharged by any of its members.

The defendant, Harris Silverman, on the stand had denied all knowledge of the letter, and it was the plaintiff's privilege to contradict that statement. The reasons given were parts of the *res gestæ* and admissible as such. It is to be observed that on cross-examination of the plaintiff he testified that Brown refused to employ him, as he had agreed to do, as soon as he (Brown) learned that he had been blacklisted.

The sixth exception was to the refusal of the Court to allow the witness, the plaintiff, to testify as to conversations over the 'phone had by Lauchheimer in his presence with the defendants at the time the plaintiff applied for work. A conversation by telephone, though the parties had to transmit their message through a third party, is *not inadmissible.* *Oskemp v. Gadsden,* 35 Neb. 7; 17 L. R. A. 440. The report of a telephone operator to a person for whom he is talking as to what is said by the other party whom he has been requested to call up, was held to be properly proved by the party for whom he was talking. *Sullivan* v. *Kuykendall,* 82 Ky. 483.

The evidence in the case was sufficient to go to the jury from which they could have found that the defendant, Harris Silverman, knew of the writing of the letter in the first instance, and had conspired with his son Moses to injure the plaintiff by the circulation of false and untrue statements, which statements, proven to be false, brought about the injury of which the plaintiff complains.

"The gravamen in a civil action is not the conspiracy, *but the malice,* the former is matter of aggravation, or inducement only in the pleading and evidence under which one or all of the defendants may be found guilty." *Van Horn* v. *Van Horn,* 10 L. R. A. 184. To the same effect are—*Kimball* v. *Harman,* 34 Md. 407; *Robertson* v. *Parks,* 76 Md. 118; *Brinkley* v. *Platt,* 40 Md.

All who aid, command, advise or countenance the commission of a tort by another, or who approve of it after it is done, without reference to comparative individual interest, are liable, if done for their benefit, in the same manner as if they had done the tort with their own hands. *Hilliard on Torts,* sec. 9.

There can be no such thing as a conspiracy to do a lawful thing unless by *unlawful* means. If one railroad company may lawfully refuse to continue in its employ a person who has been engaged in a war upon its interests, called a strike, or who has shown himself to be negligent, incompetent, inefficient or dishonest, there does not appear to be any good reason why a number of railroad companies might not agree among themselves not to employ such a person. * * * If the defendant by fraud, falsehood or force had brought about a refusal to employ the plaintiff, it would have committed a positive wrong against the planitiff which would have been actionable. *N. Y. & S. R. R.* v. *Schaffer,* 65 Ohio St. 414; 62 *L. R. A.* 931.

The agreement of the defendant, Harris Silverman, with the other members of the Clothiers' Board of Trade was in itself in the nature of a conspiracy, at least it was an agreement having for its object the united refusal of employment to any discharged employee of its members, unless that employment was sanctioned by the discharging employer. It was the union of the manufacturers as against the union of labor. It has been repeatedly decided that in the absence of statutory restrictions the employers have the same right to combine as the employees. Yet no Court has ever sanctioned either the employers or employees in using the union for a

wrongful purpose.  In every instance where an injury to
another has been attempted under the form of organized
effort the Courts have not hesitated to denounce such action
as contrary to law as well as to the peace of society and to the
rights of the individual.  And in some of the States statutes
have been passed making it a penal offense for any corpora-
tion, firm or individual to *blacklist* an employee with the in-
tent of preventing him from obtaining employment.  We cite
the following: Colorado—1 *Mills Anno. Stat.,* Ch. 15, page
487; Georgia—*Code* 1895, Sec. 1875; Indiana—*Horner's
Anno. Stat.* 1901, Sec. 5206, page 5206, q. 2; Iowa—*Code*
1897, Secs. 5027-8; Kansas—*Gen. Stat.* (Dassler), 1901,
*Laws* 1907, Secs. 2221, 2223; Minnesota—*Laws* 1895, Ch.
174, 14 a; Missouri—*Rev. Stat.* 1899, Sec. 2166; Montana—
*Political Code* 1895, Sec. 3390, 3391; *Penal Code* 1895, Sec.
656; N. Dakota—*Rev. Code* 1899, Sec. 7042; Oklahoma—
*Laws* 1897, page 144; Virginia—*Hurst's Code,* 1898, Sec.
3845 b (*Acts* 1891, 1892, page 976); Wisconsin—*Rev. Stat.*
1898, Sec. 4466 b; see note to *Wabash Ry.* v. *Young,* 162 Ind.
102, 4 *L. R. A. N. S.,* page 1118.

Under the common law, any agreement, confederation or
conspiracy to do anything with the intent to injure another is
an indictable wrong, and our own State has very clearly laid
down the common law rule in *State* v. *Buchanan,* 5 H. & J.
356.  And the liberty to employers to combine would not be
permitted if the purpose was to carry out a scheme of wrong-
ful injury to another through such combination.

Had Harris Silverman and his son deliberately agreed with
the Clothiers' Board of Trade to specially injure the plaintiff
there would be no question that it was a criminal conspiracy,
and yet that in effect is what they accomplished.

Harris Silverman is a member of the Clothiers' Board of
Trade, the very object of which union is to prevent the em-
ployment of *any* discharged employee, no matter who he may
be.  The son writes the letter which sets in motion the Cloth-
iers' Board of Trade, and its actuary, following out the usual
course in such matters, transmits to each member a letter

which asks that they unite with Harris Silverman & Sons in "making an example" of the plaintiff, and as a result of it the plaintiff is refused employment by many of the members of the said Board of Trade.

It is true the plaintiff was a member of a labor organization, but there was nothing wrong in that. On the contrary, the Supreme Court of the United States has said in *Adair* v. *U. S.,* 206 U. S. 282: "Labor organizations, we assume, are organized for the general purpose of improving or bettering the conditions and conserving the interests of its members as wage-earners, an object entirely legitimate, and to be commended rather than condemned."

In *Hundley* v. *L. & N. R. R.,* 105 Ky. 162, 63 *L. R. A.* 289, the plaintiff had been discharged by a railroad with which he had been employed. The railroad employer with others was in combination not to employ discharged employees of the other roads. The action was in "tort for the injury done plaintiff by falsely charging him with neglect of duty, thus placing him on a *blacklist.*" The Court held: "That such false entry must be regarded as *intended* to injure the discharged employee; therefore a malicious act." "Injury is the gist of the action. The liability is damages for *doing,* not for *conspiracy.*"

Conceding that the word *blacklist* has no well-defined meaning in the law, either by statute or judicial expression, the general understanding of the term is that it has reference to the practice of one employer presenting to another the names of employees for the purpose of furnishing information concerning their standing as employees. *Schaffer* v. *Justus,* 85 Minn. 279, 56 *L. R. A.* 757.

In *Blumental* v. *Shaw,* 23 C. C. A. 590, an (apprentice) employee was discharged, notices sent out saying he had *left without cause;* action for damages sustained.

And so in *Willis* v. *Muscogee Mfg. Co.,* 120 Ga. 597, an employer who *wrongfully* reports an employee and thus damages him by preventing his getting work, is liable. The Court took the position that an employer has a right to select the

employees, and an agreement among employers was lawful.
"While the corporation which entered into the agreement
had a right to do so, they owed a duty to their employees not
to abuse that right. If one of them *falsely* reported an em-
ployee, to his injury, such employee may recover for the tort.
The combination of the employers was a powerful machine
for the accomplishment of lawful results, but it was capable
of misuse to the injury of innocent employees. When a com-
pany so misuses it, such company must take the conse-
quences."

The *intent* or knowledge with which an act is done may
make a lawful act unlawful. Whilst an act which is in itself
lawful can never become unlawful simply because it may be
done by several persons instead of only one, yet the same act
may be unlawful when it is a *means* of accomplishing an
*unlawfully end. Klingel's Phar.* v. *Sharp,* 104 Md. 233.

The basic contentions of the case at bar bear a close anal-
ogy to the case of *Mattison* v. *Lake Shore* (2 Ohio N. R. 276),
where it was held that the employees' right to employment is
equally sacred with the right of the employer to employ him;
that an employer is to judge for himself whom he will have
to work for him, and it makes no difference whether he re-
fuses to let a man work for him because he is incompetent, or
because he dislikes him; he has a right to seek his employees,
but his right to discharge ends with his own employment, and
he must not touch upon the right of the employee to seek
other employment. This was said in overruling a demurrer
to a petition, which alleged among other things, that the
defendant, a railroad company, after discharging the plain-
tiff, had conspired, confederated and connived together with
a great many other railroads already acting in concert, to de-
fraud and injure plaintiff and prevent him from securing
employment in his avocation as a railroad man, and had
wrongfully, maliciously and unlawfully caused certain *black-
list* rules to be enforced against the plaintiff, thus preventing
him from getting employment. In so deciding, the Court
said: "So long as the company simply discharged the plain-

tiff, their right to make the discharge should not be questioned, but if they made *combination,* as was charged in the petition, with the other companies, that they should not employ him, they went beyond their *legal* right. *See note 62,* L. R. A., pages 717, 718; *Klingel's Pharmacy,* 104 Md. 224.

In the present case we find a letter sent out over the name of Harris Silverman & Sons, which was admitted to have been dictated, signed and mailed by the defendant, Moses Silverman, on the very day, and in fact immediately after the discharge of the plaintiff. This letter charges the plaintiff with being a disorganizer and a source of trouble (it will be remembered that Harris Silverman had already accused the plaintiff of the same offense), and it was written with the avowed purpose of "making an example of the plaintiff" and keeping him from procuring employment among the clothing manufacturers of Baltimore city who were members of the Clothiers' Board of Trade. The essential statements contained in this letter were as a matter of fact wholly false and malicious, proved to be such by the uncontradicted testimony of the plaintiff, which testimony the defendants in no particular endeavored to assail. The evidence further shows that this false and malicious letter accomplished its intended result, the blacklisting of the plaintiff, whereby he was unable to obtain work among the members of the Clothiers' Board of Trade until he had consulted counsel and instituted suit. Then, and then only, was he given work, but it is to be noted at a reduced wage. Here then we have an actual money damage, which, taken together with the value of time lost while seeking work, amounts to $96, a loss suffered by the plaintiff solely by reason of the unlawful action of the defendants in circulating a false and malicious letter.

In addition to this the plaintiff's reputation as a reliable and safe workman was injured, for he was branded as a source of trouble and a disorganizer, and it was clearly for the jury to determine how far such a charge destroyed the plaintiff's ability to procure remunerative labor.

The defendants were not in the position of a master giving to another a reputation of his former servant, and entitled to claim the privilege of such communication.

While communications by masters touching the character of servants are privileged, at the same time, wherever it appears the pretended privileged communication was merely a cloak for the indulgence of malice and personal ill-will, resentment or spite, it ceases to be any protection against civil responsibility, and in many instances by reason of its covert and insidious, if not cowardly character, will rather be regarded as a circumstance of aggravation.

The defendants may claim that they were within their rights in advising their fellow members in the Clothiers' Board of Trade not to employ plaintiff, and had they stopped at that point, there might be some weight to their contention. But they went further than any good to themselves or their fellow members could justly warrant, and the case at bar is not such a one in which the defendants can shield themselves behind such a defense. There was no duty, either moral or legal, resting upon the defendants in the matter. The information sent out by them, *if true,* had not been given in response to an enquiry of anyone about to employ the plaintiff. It was information *voluntarily* given, and had all the accompaniments of *express malice* which gave the plaintiff the right to recover such damages as he established. *Fresh* v. *Cutter,* 73 Md. 87.

They had deliberately started to wreak their vengeance on plaintiff for his supposed wrong, and to *"make an example of him"* that all the world might see him branded as a *disorganizer* and unfit to be employed. No possible good to the defendants or their fellow members in the Clothiers' Board of Trade could under any circumstances come to them from such a charge, while every species of wrong to his rights must necessarily flow from such an injury.

*William S. Bryan, Jr.,* and *Sylvan Hayes Lauchheimer,* for the appellees.

No testimony was offered that any partnership existed among the defendants at the time the letter was written, or that the defendant, Moses Silverman, had any authority to write the letter. Even if the plaintiff had shown the existence of a partnership on the day on which the letter was written, under the authorities, the writing of this letter by one partner, without the prior knowledge or consent of, or the subsequent ratification by, the other partners, could not have bound the other partners thereto, and no liability in an action of tort would attach to the other partners, because of the action of one partner in writing such a letter. This is well established by recent decisions of this Court. *Kirk* v. *Garret,* 84 Md. 383; *Bernheimer* v. *Becker,* 102 Md. 250.

The fact that a letter was written and that for two weeks the appellant failed to receive employment means nothing. He may not have received employment for any number of reasons, viz: There may have been no vacancy, or any number of other considerations might have controlled the employers in not engaging the appellant, and until it appears from the testimony that the employers refused to engage the appellant because of some action of Moses Silverman or the other appellees it would be the sheerest kind of speculation to say that because a letter was written and Wilner did not secure employment for two weeks, the latter was the effect and the former the cause. Indeed, this Court has declared that the mere happening of one event does not justify an inference that it was caused by another, but that there must be a concurrence of event and cause and the nexus between them must be shown to exist to constitute a cause of action. *Benedick* v. *Potts,* 88 Md. 52; *B. & O. R. R. Co.* v. *State, use of Black,* 108 Md.

The mere sending of a letter is not sufficient. A connection between the sending of the letter and the discharge must be shown. *Wabash Railway Company* v. *Young,* 4 *L. R. A.* (*n. s.*) 1091.

The appellant failed to show that any damage was sustained by him because of any action of the appellees. He placed but one employer on the stand, and that employer stated that he was not influenced by any rule of the Clothiers' Board of Trade (no rule, however, was proven to exist), and that he did not think that when Wilner applied to him for a position he had a vacancy. Beyond this there is nothing to show why Wilner failed to secure employment from the half a dozen houses from whom he solicited employment (although there were over one hundred employers of cutters in Baltimore), and until this be shown, no matter how wrongful the act of the appellee Silverman might have been, no right of action exists because one of the essential elements necessary to constitute a right of action would not be present.

The appellee, Harris Silverman, had the right to discharge the appellant at any time, with or without cause, no matter how malicious, capricious or arbitrary his action might have been. "It is a part of every man's legal rights," said JUDGE COOLEY, "that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason, or is the result of whim, caprice, prejudice or malice." *Klingel's Pharmacy* v. *Sharp & Dohme,* 104 Md. 218; *My Maryland Lodge* v. *Adt,* 100 Md. 249; *Adair* v. *United States,* 208 U. S. 175; *Henry* v. *R. R. Co.,* 139 Pa. St. 291; *Boyer* v. *Western Union Telegraph Co.,* 124 Fed. Rep. 248; 2 *Cooley on Torts,* 3rd Ed., page 591.

The writing of the letter to the Actuary of the Clothiers' Board of Trade did not violate any right of the appellant. An inspection of that letter will show that it was merely a request to the other members of the Clothiers' Board of Trade not to employ Wilner, a request which might have been disregarded by any of them, and which was in fact disregarded when Wilner was employed by one of the members and put to work on January 7, 1907.

This Court has recently said that a party may use persuasion to accomplish his end, but may not use force, violence, intimidation or perjury. *My Maryland Lodge* v. *Adt,* 100

Md. 238, 250; *Klingel's Pharmacy* v. *Sharp & Dohme,* 104 Md. 218.

This letter was merely an attempt to use persuasion to induce the members of the Clothiers' Board of Trade to refrain from employing Wilner; the appellee had no power to coerce them and did not threaten them in any wise if they did employ him. He did what this Court has said he had the right to do, and although as a matter of fact, as has been shown before, no damage resulted to the appellant because of the writing of this letter, even if it had, the letter being an attempt at persuasion, did not violate any right which the appellant had and which the appellee Silverman was bound to regard (the appellee Silverman being employed by his father, Harris Silverman, and thinking that he was doing an act for the benefit of his employer). *My Maryland Lodge* v. *Adt,* 100 Md. 249; *Klingel's Pharmacy* v. *Sharp & Dohme,* 104 Md. 232; *Bohn Mfg. Co.* v. *Northwestern Lumbermen's Assn.,* 54 Minn. 223; 21 *L. R. A.* 337; *Bradley* v. *Pierson,* 148 Pa. St., 502, 503.

The letter written by the appellee, Moses Silverman, to the Actuary of the Clothiers' Board of Trade contained the statement that Wilner had been a source of trouble and had been trying to disorganize the rule of the appellee, Harris Silverman. The testimony of Wilner himself shows this to be true, inasmuch as he admits that he endeavored to make one of the employes of the appellee discontented after he had accepted employment at a wage of which Wilner did not seem to approve. This in itself shows the truth of the statements made in the letter, but whether a man is a disorganizer and whether the use of that term is an epithet of opprobrium, is after all only a matter of opinion, about which people might well differ. Some men might think it their duty to be disorganizers, as did George Washington, Charles Stewart Parnell, and other leaders. But even though this was not so, it has been held that calling a person a "labor agitator," which is even stronger than a "disorganizer," is not libelous. *Wabash Railway Co.* v. *Young,* 4 *L. R. A.* (n. s.) 1091, 1097, 1098.

HENRY, J., delivered the opinion of the Court.

This is an action on the case brought by the appellant, the plaintiff below, against the appellees, the defendants below, grounded on a declaration containing four counts, the first three of which allege in substance that the defendants, after discharging the plaintiff from their employment, maliciously conspired or contrived to injure him by blacklisting him and writing a letter, containing false statements, to the members of an association, known as The Clothiers' Board of Trade of Baltimore City and requesting such Association members to refuse employment to the plaintiff, while the fourth count sets out at length the details of the grievance complained of, omitting the charge of conspiracy.

The defendants filed the general issue plea, and the verdict, under the instruction of the Court, being for the defendants, the plaintiff entered an appeal to this Court.

The appellant was a cutter of cloth in the establishment of Harris Silverman, one of the appellees, in Baltimore City, and on December 19, 1905, was discharged, his employer sending for him on the afternoon of that day to come to his office, and saying to him: "Willner, you are a disorganizer and an agitator, I cannot use you any longer; here is your envelope," which contained wages up to date.

When Willner asked why he said that, Mr. Silverman replied: "Because you told a man, who has worked for me before and who left me and started in again, I hired him yesterday—you told him to ask for more money." Willner said: "Mr. Silverman, I did not tell him to ask for more money, I merely said to him, 'Cosman, is that true what a fellow tell me that you started in again for $2.75.' He said: 'yes;' I said: 'Charlie, I am surprised at you.'"

It seems that the man, Cosman, who had been hired the preceding day, in consequence of this conversation with the appellant, demanded an increase of wages to $3.00 per day, which was granted.

On the day of the discharge, Moses Silverman, son of Harris Silverman, and one of his employees, wrote the fol-

lowing letter to the Clothiers' Board of Trade, an organiza-
tion comprising in its membership about twenty clothing
dealers of Baltimore, including Harris Silverman, one of
the appelleees, it being one of the rules of said association
that an employee discharged by one member should be re-
fused employment by all other members.

"BALTIMORE, December 19, 1906.

MR. SYLVAN HAYES LAUCHHEIMER,

Local.

DEAR SIR:—

We desire to call your attention to Mr. Jos. Willner, a cutter
who was formerly in my employ. We would request you to see
that he is refused employment in all Association houses in which
he may apply for a position. He was the shop chairman of my
cutting room, and in addition to this, he has been a source of
trouble. In other words, he has been trying to disorganize my
rule. We took on a cutter yesterday at a certain price, and
when he went to work this morning, he told him to insist on
more money, otherwise we suppose they would have made it un-
pleasant for him. He came down and stated his demand, to
which we acceded, but thought we would be better off by dis-
charging Mr. Willner, who was the cause of the disturbance.
We think it no more than right that the Association should back
us up in this matter, and refuse this man employment, as we
would like to make an example of him.

Yours truly,

M. S.          (Signed)   HARRIS SILVERMAN & SONS."

Evidence was offered tending to prove that this letter was
duly received by the Clothiers' Board of Trade, and that cop-
ies of the same were made by the clerk, according to routine,
and promptly delivered to the various members of the Asso-
ciation.

Willner, on the morning after his discharge started out to
secure other employment, and continued his efforts, without
success, until January 4th, following, when he was employed
by M. Lauchheimer & Sons, one of the members of the

Clothiers' Board of Trade. In his search for work, the plaintiff made application to eight different clothing firms in Baltimore, six of them being members of the aforesaid Association.

At the conclusion of the plaintiff's testimony, the defendants offered two prayers, the first asking the Court to instruct the jury that there was no evidence legally sufficient to entitle the plaintiff to recover, and their verdict must be for the defendants, and the second asking for an instruction that there was no evidence legally sufficient to entitle the plaintiff to recover against Harris Silverman and Louis Silverman.

Both of these prayers were granted, to which action the plaintiff excepted, and these exceptions constituting the 11th and 12th bills will be first discussed.

Preliminary thereto, it may be well to announce as a principle of law that any malicious interference with the business or occupation of another, if followed by damage, is an actionable wrong. Such interference may be by a single individual, or by a number of individuals conspiring together, but it is the damage which constitutes the gist of the action, and not the conspiracy, the latter being a matter of aggravation, if proven, as affecting the means and manner of redress. We find no Maryland case that goes to the extent of sustaining the position contended for by the appellant to the effect that the "blacklisting" of discharged employees by a combination of employers is in itself actionable, without proof of damage. In the case of *Walker* v. *Cronin,* 107 Mass. 562, it is stated that to maintain an action of this character it is necessary for the plaintiff to prove—"(1) intentional and wilful acts; (2) calculated to cause damage to the plaintiffs in their lawful business; (3) done with the unlawful purpose to cause such damage and loss, without right or justifiable cause on the part of the defendants (which constitutes malice); and (4) actual damage and loss resulting."

An employer, where no right of contract is involved, may lawfully discharge an employee at what time he pleases and

for what cause he chooses, while, on the other hand, an employee may sell his labor to whomsoever he desired at such wages as he is willing to accept and may quit such employment at his pleasure, yet neither has the right to interfere, without cause, with the business or occupation of the other.

While the law does not furnish a shield against the effects of fair and honest competition, yet injury to the business of another, if accomplished by threats or coercion, constitutes a ground of action for damages on the part of the person so injured.

In furtherance of their common welfare and in settlement of their ofttimes conflicting interests, both employers and employees stand upon a plane of perfect equality before the law, enjoying the same freedom and amenable to the same restrictions. Both may combine in unions or associations, but such associations, like individuals, must employ lawful methods for the attainment of lawful purposes.

This was not always so, as appears from the account of the progress of trade unions, as given in the 2nd volume of McCarthy's "History of Our Own Times," referred to by the appellant's brief. Looking at the subject in retrospect it is difficult to understand how the conditions and sentiments therein described could obtain lodgment in public opinion or receive sanction in the Courts, for it is now clearly settled that the same law which permits the organization of employers and interposes to protect manufacturers or merchants from the violence of "strikes," or the "intimidation of boycotts," is also vigilant to see that the right and opportunity to work, which is the most valuable asset of the laboring man, as well as the privilege of organization, shall not be unjustifiably interfered with by employers, acting either as individuals or in combinations. *Barnes* v. *Typographical Union,* 232 Ill. 424; *Walker* v. *Cronin,* 107 Mass. 562; *Kimball* v. *Harman,* 34 Md. 407; *Robertson* v. *Parks,* 76 Md. 135; *Klingell's Pharmacy* v. *Sharpe & Dohme,* 104 Md. 231; 8 *Cyc.,* 650.

About the first element for recovery in the plaintiff's case,

we have no difficulty. While the letter of December 19th
aforesaid, is not couched in extravagant language, yet it does
not state the facts of the case with entire accuracy, and the
concluding sentence of the letter is some evidence of malice
on the part of the writer, and the circulation of such letter
through the instrumentality of the Clothiers' Board of Trade
was an actionable wrong, provided damage resulted there-
from.

On this latter point, we think that the receipt of the letter
of December 19th, by the members of the Clothiers' Board of
Trade, a body of men engaged in a like business and associ-
ated together partly, if not primarily, for the purpose of dis-
ciplining employees, are facts affording some evidence from
which the jury might infer that the refusal of employment to
the plaintiff was because of the rule of the association and the
request for its enforcement by the defendants.

Furthermore it is in evidence that one Brown, not a mem-
ber of the Clothiers' Board of Trade, refused the plaintiff
employment after hearing that the applicant had been black-
listed. Although this information was communicated to
Brown by the plaintiff himself, under circumstances which
at least leaves it doubtful as to whether he was actuated by a
high moral sense or by a collusive purpose, with Brown, who
was his personal friend, to aid in the prosecution of a con-
templated law suit against these defendants, yet it was evi-
dence of injury, the weight of which it was for the jury to
decide.

The question next arises, who of the appellees is responsi-
ble for the wrong alleged in the narr. The uncontradicted
testimony shows that the firm of Harris Silverman & Sons
was not in existence at the time the above-quoted letter was
written, nor was there any evidence whatever to show that
Louis Silverman had any connection with the case. There-
fore as to the firm of Harris Silverman & Sons, which did not
come into existence until January 1st, 1906, and as to Louis
Silverman, individually, it is clear that there was no right
of action.

Concerning Harris Silverman, there is no evidence legally sufficient to show that he either authorized or subsequently ratified the action of his son in writing the letter. The only circumstance from which it could be inferred that he had knowledge of the letter and took no steps to repudiate it, is that, being a member of the Clothiers' Board of Trade, a copy was delivered to him along with the other members, but this is opposed by the equally logical inference that the clerk might not have deemed it necessary to deliver to Silverman what was practically a copy of his own letter. Harris Silverman was a witness for the plaintiff, and in reply to a question as to whether he wrote the letter said: "Positively not; I have no knowledge of it; don't know a thing about it, sir." This is a broad answer, but even if held to be merely responsive to the question concerning the writing of the letter, it was easy for the plaintiff to have followed the question up by a direct question as to when, if ever, the letter came to his knowledge. This the plaintiff failed to do, and we think has left the testimony in too vague and indefinite a shape to provide a basis for the jury to infer a subsequent notice and ratification of the letter by Harris Silverman. Nor is there any ground for holding the father responsible on the ground of the agency of the son, Moses Silverman. The latter testified that he was an employee, who occasionally wrote letters of minor importance, but not on subjects of serious business. The letter in question was clearly not about a routine matter, but was outside of the usual course of business, about which, according to the only testimony in the case, the son would have no authority to take any steps whatever. Holding these views, we think the second prayer of the defendants was properly granted by the Court.

Moses Silverman admits writing the letter in question, and, under the fourth count of the narr., but not under the other counts, the plaintiff has a right of action against him. The first prayer of the defendants was, therefore, improperly granted, and the judgment on that account should be reversed and the cause remanded for a new trial.

Md.]                    Opinion of the Court.

There remain some minor matters to be considered. The seventh exception was waived by the appellant, and the third, fourth, eighth, ninth and tenth exceptions, relating to the refusal of the Court to admit in evidence a copy of the letter of December 19th (which letter was subsequently admitted at a later stage of the proceedings), it was conceded, were not vital and it is not necessary to discuss them.

This leaves open for consideration the first, second, fifth and sixth exceptions. The first exception relates to the refusal of the Court to permit the plaintiff to ask Mr. Lauchheimer, the actuary of the Clothiers' Board of Trade, the following question:

"I will ask you now to tell candidly to the jury whether you have any doubt that letter (referring to the Lauchheimer letter) was issued out of your office over your signature, over your typewritten signature?"

The witness had already stated that he had no knowledge of the said letter having been issued from his office, and had testified as to what was the routine of the office in such matters, and we do not think that the circumstances called for an expression of opinion from him. The facts in connection with the letter and of the witness' knowledge of it were already in evidence and it was for the jury to say from these facts whether or not the letter was issued, and, if so, by what authority.

The second exception was to the propriety of a question as to whether the Directors of the Clothiers' Board of Trade directed the transmission of copies of the Silverman letter to the members of the Association. The ruling of the Court in admitting the question was harmless, if erroneous, and therefore not necessary to be considered.

While on the stand, in his own behalf, the plaintiff was asked this question: "What reason, if any, was given by the various people to whom you applied for their refusal to employ you?" An objection to this question was sustained by the Court, and this action constitutes the plaintiff's fifth bill of exception. In this ruling, we think that the lower

Court was correct. An answer to the question would have fallen within the limits of hearsay evidence. Neither the parties applied to, nor the Association of which a majority of them were members, were parties to the suit, and their replies would not have been admissible against the defendants. The parties themselves should have been called to the stand to testify on this point.

The sixth exception was to the refusal of the Court to allow plaintiff to testify to a telephone conversation between Silverman and Lauchheimer, the plaintiff being in the latter's office while the conversation was in progress and claiming that it was repeated to him at the close. The authority cited by the appellant does not sustain the position taken by him. In the case cited, 82 *Ky.* 483, the operator of the telephone had been expressly directed by one of the parties to call up a person at a distant point and to converse with such person, asking the questions and repeating the replies as they were given to him, and the Court held that the operator was the agent of both parties, and that in a subsequent suit between the parties the one who had requested the operator to talk for him could testify to what was repeated to him at the time by such operator. There is no such circumstance in the present case, and it would have been clearly hearsay to have permitted the plaintiff to tell the conversation. 16 *Cyc.* 1196 and Note.

Although, in our opinion, the evidence, as set forth in the record, is legally insufficient to entitle the plaintiff to recover as against Harris Silverman and Louis Silverman individually, or against the firm of Harris Silverman & Sons, yet, as the judgment is an entirety which cannot be affirmed as to some and reversed as to other defendants, we must, for error in granting the defendant's first prayer, simply reverse the judgment and remand the case for a new trial. *East Baltimore Lumber Co.* v. *The K'Nesset Israel Aushe S'Phard Congregation et al.,* 100 Md. 689, and cases therein cited.

> *Judgment reversed with costs to the appellant, and cause remanded for new trial.*