**RCM SUPPLY COMPANY, INC., Appellee,**

v.

**HUNTER DOUGLAS, INC., a Delaware Corporation, Hunter Douglas, NV, a Netherlands Antilles Corporation, Appellants,**

and

**Whittaker Corporation, Defendant.**

**No. 81–1662.**

United States Court of Appeals, Fourth Circuit.

Argued Feb. 3, 1982.

Decided Sept. 7, 1982.

Victor S. Friedman, New York City (William M. Pinzler, Eric H. Queen, Fried, Frank, Harris, Shriver & Jacobson, New York City, Thomas D. Washburne, Ober, Grimes & Shriver, Baltimore, Md., on brief), for appellants.

Paul V. Niemeyer, John E. Griffith, Jr., William L. Marbury, Piper & Marbury, Baltimore, Md. (Leonard R. Goldstein, Goldstein & Ahalt, College Park, Md., Chartered, on brief), for appellee.

Before BRYAN, Senior Circuit Judge, and RUSSELL and SPROUSE, Circuit Judges.

ALBERT V. BRYAN, Senior Circuit Judge:

Attacked by this appeal is a judgment for $4,268,627.00, awarded for injuries resulting from an alleged violation of the Federal antitrust laws and the common law of Maryland. Our inspection of the briefs and record in this singularly complex case discloses certain infirmities fatal to the judgment. We therefore reverse.

## I. Facts

The principal parties in this litigation are three corporations: Hunter Douglas, N.V. (HDNV), a multinational corporation based in the Netherlands; Hunter Douglas, Inc. (HDI), the wholly owned American subsidiary of HDNV; and RCM Supply Co. (RCM), a Maryland corporation which has been reorganized under Chapter 11 of the new bankruptcy act, 11 U.S.C. § 101 et seq.

Prior to 1976, RCM was engaged in the business of applying aluminum siding to new and existing homes, purchasing its siding materials exclusively from the Crown Aluminum Division (Crown) of Whittaker Corporation of Durham, North Carolina. RCM operated solely in the metropolitan Washington, D. C., area where the "Williamsburg colors" featured by Crown were especially popular. In February 1977, Whittaker sold the Crown operation to HDNV, who placed it under the auspices of HDI.

By early 1976 RCM decided to expand its operation and become a distributor of siding materials to other appliers. A Crown franchise was sought and obtained, requiring RCM to build a warehouse and otherwise expand its operation to accommodate the additional stock of siding necessary to operate a distributorship. RCM claims that Crown officials orally promised to provide it with a distributor's "lowest price" discount on all purchases and an unspecified amount of credit, labelled "trade support," for making such purchases.

During the year following HDI's acquisition of Crown, RCM expanded its line of sidings by offering the products of Revere Aluminum Building Products, Inc. (Revere). RCM avers that HDI viewed this action as a display of disloyalty. After failing to discourage RCM from dealing with Revere, HDI allegedly pursued a successful course of action designed to ruin RCM's business and force it into bankruptcy. This undertaking is said to have included, *inter alia*:

(1) breaching the agreement to provide RCM with lowest prices and trade support, and (2) stealing RCM's customers by offering them distributor's prices despite their failure to meet the established prerequisites for that privilege.

RCM commenced this litigation May 2, 1980, in the Federal District Court for Maryland, naming HDNV and HDI as defendants.[1] Of the divers claims alleged in the complaint, the following were submitted to the jury via special interrogatories:

(1) an attempt to monopolize the metropolitan Washington siding market in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

(2) a breach of the oral promise, upon which RCM detrimentally relied;

(3) malicious interference with business relations, a Maryland common law tort;

(4) wrongful use of trade secrets, another State tort; and

(5) commercial slander, also a Maryland tort claim.

The jury was further permitted to consider an award of punitive damages against both defendants for the actions constituting the three torts.

The jury found in favor of RCM on all of the enumerated claims and assessed an additional award as punitive damages, the total of the verdict being $4,548,525.00. Responding to the defendants' motion for judgment n.o.v. or a new trial, the trial judge struck the jury's verdict for RCM on the tort claims for wrongful use of a trade secret and commercial slander. As the punitive damages applied to all three torts without distinction, that award was reduced by two-thirds to compensate for the stricken claims. In all other respects, final judgment, totalling $4,268,627.00, was entered in accordance with the verdict. The particulars of the jury's award and the District Court's adjustments are set forth in the margin.[2] RCM has not appealed any of the rulings adverse to them.

## II. Antitrust Claim

HDI raises a variety of challenges to the judgment for attempt to monopolize the Washington siding market. We need to consider but one of these assignments of error, for we hold that RCM failed to produce evidence restricting the relevant geographic market to the metropolitan Washington area.[3]

To establish an actionable attempt to create a monopoly, a plaintiff must define the contours of the market place subject to monopolization. In particular, the market must be delineated with respect to the relevant product and geographic area affected. *See generally* II P. Areeda & D. Turner, Antitrust Law ¶ 517 (1978). The standard for determining the relevant geographic market in disputes between buyers and sellers of supplies, announced in *Tampa Electric Co. v. Nashville Co.*, 365 U.S. 320, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961), was para-

1. Whittaker Corporation, Crown's former parent, also was named as defendant in the complaint. All claims against Whittaker, however, were dismissed before the case was submitted to the jury.

2.

| Claim | Awarded by Jury | Allowed by Court |
|---|---|---|
| Sherman Act § 2 (trebled) | $3,000,000.00 | $3,000,000.00 |
| Breach of promise | 1,128,663.00 | 1,128,663.00 |
| Malicious interference with business relations | 34,966.00 | 34,966.00 |
| Misuse of trade secrets | 34,966.00 | 0.00 |
| Commercial slander | $ 34,966.00 | $ 0.00 |
| Punitive damages | 314,964.00 | 104,998.00 |
| TOTAL | $4,548,525.00 | $4,268,627.00 |

3. More specifically, RCM sought to restrict the relevant geographic market to the following units:

Anne Arundel, Calvert, Charles, Frederick, Howard, Montgomery, Prince Georges, and St. Mary's Counties, Maryland; Arlington, Clarke, Fairfax, Fauquier, King George, Loudoun, Prince William, and Stafford Counties,

phrased aptly in the District Court's charge to the jury in the instant case: [4]

> [y]ou must consider that the geographic market should consist of *an area in which the Defendants operate and which the Plaintiff can reasonably turn to for supplies.* If you determine that, as a practical matter, RCM can only turn for supplies or purchase their relevant markets [sic] in the so-called Washington market, then that market is the geographic market for Section 2 purposes. On the other hand, if you determine that RCM could turn for supplies in an area broader than the Washington market, then the larger market would be the geographic market for Section 2 purposes. In determining what is the area in which RCM can practically turn for supplies, you should consider whether there are any differences in transportation costs, distribution facilities, customer inventory or any other factor that would cause the Plaintiff to turn to the suppliers solely within the so-called twenty county area. (Accent added)

■ Thus instructed, the jury was tendered an interrogatory asking it to set the relevant geographic market as either the United States east of the Mississippi River or the metropolitan Washington area; the latter was selected. This conclusion, however, is contradicted by RCM's own admissions; it could and did obtain supplies from outside metropolitan Washington. HDI's siding was shipped from Durham, North Carolina, and Revere products originated in Chicago. Other suppliers approached by RCM as potential replacements for HDI were located in Pittsburgh and Detroit. In fact, to meet the rigors of competition in the siding industry, any supplier would assume the expense of shipping its products to Washington.

We cannot accept RCM's explanation that the outside distributors would not sell their products in Washington unless they had access to a warehouse in the area. Assuming the truth of that proposition, the simple fact is that RCM owned a warehouse which both HDI and Revere considered adequate for shipping their products to RCM from without the Washington area. Absent any support in the record, we cannot presume that other potential suppliers would be unwilling to accept RCM as a distributor of their products. As RCM has failed to prove a necessary element of its antitrust claim, its judgment on that count cannot stand.

### III.   Malicious Interference with Business Relations

HDI next assails the thoroughness of the District Court's instruction of the jury regarding this claim. That charge reads:

> To find that the defendant maliciously interfered with the Plaintiff's business relations, the Plaintiff must prove ... four elements ... by a preponderance of the evidence. First, that the Defendant willfully and intentionally acted. Second, that those willful and intentional acts were calculated to cause damage to the Plaintiff in its lawful business pursuits. Thirdly, that those acts were done with the unlawful purpose of causing loss or damage to the Plaintiff's business and undertaken without just cause. And fourth, that the Plaintiff was directly damaged by that activity.

As this claim arises in the pursuit of RCM's former customers by HDI, it contends that the District Court should have instructed the jury that such behavior, if in

and Fairfax and Alexandria Cities, Virginia; and the District of Columbia.

4. RCM relies heavily on statements by several witnesses that the siding industry generally regards metropolitan Washington as a distinct marketing region. This common conception of a geographic market, however, is not interchangeable with the more precise definition required by *Tampa Electric.* The *Tampa Electric* test is carefully tailored to reflect the potential monopoly power of a seller-defendant in

disputes of this nature. To the extent that cases decided under § 7 of the Clayton Act, 15 U.S.C. § 18, suggest that a less rigorous definition of the geographic market applies, we find those cases distinguishable. *See generally* Comment, *Relevant Geographic Market Delineation: The Interchangeability of Standards in Cases Arising Under Section 2 of the Sherman Act and Section 7 of the Clayton Act,* 1979 Duke L.J. 1152.

the course of commercial competition, is privileged. We agree.

■ The trial court's instruction is taken, without material alteration, from two Maryland cases on interference with prospective contractual relations. *Beane v. McMullen*, 265 Md. 585, 603, 291 A.2d 37, 47 (1972); *Willner v. Silverman*, 109 Md. 341, 355, 71 A. 962, 964 (1909). Neither of those cases, however, involved disputes between competitors.[5] When a plaintiff alleges that a competitor has interfered with a potential business relation, the latter's actions are protected by a competitive privilege under the law of Maryland unless certain exceptions are found applicable.

> When B is legally free to deal either with C or with A, the privilege of competition implies a privilege on the part of A to induce B to deal with him rather than with C.

*Horn v. Seth*, 201 Md. 589, 593, 95 A.2d 312, 314 (1953), (quoting Restatement of Torts § 768(i) (1934); *accord, Goldman v. Harford Road Building Association*, 150 Md. 677, 685, 133 A. 843, 845 (1926); Restatement (Second) of Torts § 768(1)(a) (1977).

■ RCM contends that the District Court's charge adequately stated the privilege of competition. More precisely, attention is drawn to the third element of the instruction which stated that RCM could recover only if HDI acted "without just cause." We find it incredible that a reasonable juror could take a working understanding of the privilege of competition from such general language. HDI therefore was entitled to the specific privilege instruction, and the District Court's failure

to give it was prejudicial error. *See, e.g., Ballwanz v. Isthmian Lines, Inc.*, 319 F.2d 457, 460 (4th Cir. 1963); *Turner v. Kelly*, 262 F.2d 207, 210 (4th Cir. 1958). As this underlying tort judgment has proved defective, it necessarily follows that the award of punitive damages must also fall.

### IV. Detrimental Reliance

■ Suffering from two major infirmities, the judgment for RCM on this promissory estoppel claim[6] likewise must be reversed. We begin with the principle that, to recover under this theory, the plaintiff must establish that its reliance on the defendant's promise was reasonable. *E.g., Ramsay v. Cooper*, 553 F.2d 237, 240 (1st Cir. 1977); *N. Litterio & Co. v. Glassman Construction Co.*, 319 F.2d 736, 739 (D.C.Cir. 1963). In the instant case, RCM contends that it expended $951,000.00[7] in reliance upon the oral promise by HDI's officials to provide it with their lowest price and an unlimited line of credit for an indeterminate period of time, without regard to the state of RCM's financial condition. We find that incurring such large debts in reliance solely upon an oral promise of this nature clearly exceeds the bounds of commercial reasonableness and hence cannot support recovery under principles of promissory estoppel. *See, e.g., Gruen Industries, Inc. v. Biller*, 608 F.2d 274, 280–81 (7th Cir. 1979); *Reamer v. United States*, 532 F.2d 349, 352 (4th Cir. 1976).

■ We need not rest our decision on this point alone, however, because RCM failed in a second necessary element of its proof.

---

**5.** The controversy in *Beane* arose over two neighbor's dispute about the use of one's property. Although an employer's "blacklisting" of a former employee prompted the litigation in *Willner*, the parties were not treated as potential competitors. The employer's action was motivated by his desire to quell labor unrest, rather than to stifle competition. Indeed, the court in *Willner* stated that "the law does not furnish a shield against the effects of fair and honest competition . . . ." 109 Md. at 356, 71 A. at 964.

**6.** The classic statement of this common law cause of action is found in § 90 of the Second

Restatement of Contracts, which reads in pertinent part:

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

**7.** Although RCM's counsel requested this amount in his closing remarks, the jury increased the award to $1,128,663.00. *See* note 2 *supra*.

Damages recoverable under a claim of detrimental reliance are carefully circumscribed; the plaintiff may recover only those specific expenditures made in reliance upon the defendant's promise.[8] The following illustration by the American Law Institute closely parallels the instant controversy:

> A applies to B, a distributor of radios manufactured by C, for a "dealer franchise" to sell C's products. Such franchises are revocable at will. B erroneously informs A that C has accepted the application and will soon award the franchise, that A can proceed to employ salesmen and solicit orders, and that A will receive an initial delivery of at least 30 radios. A expends $1,150 in preparing to do business, but does not receive the franchise or any radios. B is liable to A for the $1,150 but not for the lost profit on 30 radios.

Restatement (Second of Contracts § 90, Comment d, Illustration 8 (1981). *See also Dialist Co. v. Pulford*, 42 Md.App. 173, 180–184, 399 A.2d 1374, 1380–82 (1979).

The trial judge correctly charged the jury on the prescribed method for computing reliance damages; RCM, however, failed to produce any evidence of specific expenditures made in reliance upon HDI's representations. In its argument to this Court, RCM references a series of exhibits comprising its tax returns and auditors' reports from 1976 to 1979, which totally fail to distinguish the relevant expenditures.

Moreover, in his closing argument RCM's counsel asked the jury to consider a single exhibit in fixing the damages for this claim. That exhibit, RCM's no. 195A, discloses no particular expenses; rather it purports to demonstrate "the present value of [RCM's] income, as of April, 1981, if relationship between [HDI] and RCM had continued on the same basis as it had before 1979 ..." Armed only with these exhibits, the jury plainly was without any evidence for computing the proper measure of reliance damages. That award consequently must be stricken.

The judgment of the District Court accordingly is reversed in all respects and remanded for disposition not inconsistent with this opinion.

REVERSED AND REMANDED.

SPROUSE, Circuit Judge, concurring and dissenting:

I concur in the result reached in Part IV of the majority opinion, although I disagree in part with the majority's rationale. I must dissent from Parts II and III, and would affirm that portion of the district court's judgment, entered on a jury verdict, awarding RCM $3,000,000 on its Sherman Act claim and $34,966 on its common law claim for malicious interference with business relations.

I.

My quarrel with Part IV of the majority opinion arises from its conclusion that RCM's reliance on the promises of HDI was not commercially reasonable. The evidence, viewed in the light most favorable to RCM, the appellee, was that RCM's president, Larry McCarthy, and HDI's representative, David Mount, not only had a long-standing business relationship, but also were close friends at the time Mount made the promises in question to McCarthy. In order to induce RCM to become a distributor, HDI promised trade support—a line of credit to purchase the product—and Hunter Douglas' best price. Relying on these representations, RCM agreed to shift its operations from application to distribution; it moved to a new and larger warehouse, purchased trucks and hired personnel. The jury found that RCM's reliance on HDI's representations, viewed in the context of the on-going RCM/HDI relationship, was commercially reasonable. Because this determination is not against the clear weight of the evidence adduced at trial, it should be permitted to stand.

---

**8.** The damage award must be reduced by "the value of any benefits ... derived from the [expenditures]," *Allied Equip. Co. v. Weber Engineered Prods., Inc.*, 237 F.2d 879, 882 (4th Cir. 1956), and by any unavoidable loss suffered by plaintiff without regard to the defendant's conduct. Restatement (Second) of Contracts § 349 (1981).

However, as the majority notes, RCM's claim ultimately must fail as no evidence was produced of specific expenditures made in reliance upon HDI's representations.

## II.

The majority in Part II of its opinion reverses the district court's Sherman Act treble damage award of $3,000,000 on the basis that there was not sufficient evidence to sustain the jury's finding that a 20-county area surrounding Washington, D. C., was the relevant geographic market.[1] I disagree and would affirm that portion of the judgment.

The majority concedes, as does HDI, that the district court correctly instructed the jury as to the proper definition of relevant geographic market and appropriately permitted them to determine the market by special interrogatory. The jury was told:

The geographic market that you select must both correspond to commercial realities of the industry and be economically significant. Thus, although the geographic market may be national or international, under other circumstances, it may be as small as a single metropolitan area. Further, there is no requirement that the existence of a national market preclude the existence of a subject [sic] market in a regional area, if you should find from the facts and the realities of the market. The same of course is true for the product market definition. In this case, you have heard testimony from the Defendant that the relevant geographic market is an area in which it operates, specifically, an area roughly east of the Mississippi River. The Plaintiff has submitted to the contrary that the relevant geographic market is the twenty county area that has been referred to as the Washington market. In determining which of these two views is

the proper one, you must consider that the geographic market should consist of an area in which the Defendants operate and which the Plaintiff can reasonably turn to for supplies. If you determine that, as a practical matter, RCM can only turn for supplies or purchase their relevant markets [sic] in the so-called Washington market, then that market is the geographic market for Section 2 purposes. On the other hand, if you determine that RCM could turn for supplies in an area broader than the Washington market, then the larger market would be the geographic market for the Section 2 purposes. In determining what is the area in which RCM can practically turn for supplies, you should consider whether there are any differences in transportation costs, distribution facilities, customer inventory or any other factor that would cause the Plaintiff to turn to the supplies solely within the so-called twenty county area.

The majority now seeks to substitute its judgment for that of a properly instructed jury. While the *Tampa Electric* rule cited by the majority is indisputably correct, and in fact was paraphrased in the district court's instructions, the majority's exclusive reliance on this rule is misleading. Market definition is always a matter of judgment;[2] the legal rule guiding the jury's consideration of evidence determining the relevant market is not a rigid rule, nor could it be. As the Supreme Court has recognized:

Congress prescribed a pragmatic factual approach to the definition of the relevant market and not a formal, legalistic one. The geographic market selected must, therefore, both 'correspond to the commercial realities' of the industry and be economically significant. Thus, although the geographic market in some

1. Although there has been some scholarly criticism of the proposition, *see, e.g.*, Moore, The "Relevant Market" Question in an Attempt to Monopolize Case Under Section 2 of the Sherman Act, 10 Sw.L.Rev. 103 (1978), the present position, at least in this Circuit, is that the plaintiff in an attempt-to-monopolize case must

prove a "relevant market," which comprises both a geographic and a product market. *American Football League v. National Football League*, 323 F.2d 124 (4th Cir. 1963).

2. L. Sullivan, Handbook on the Law of Antitrust § 12, at 42 (1977).

instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area. *Brown Shoe Co. v. United States*, 370 U.S. 294 at 336–37, 82 S.Ct. 1502, at 1529–1530, 8 L.Ed.2d 510 (1962).[3]

The jury is permitted, if not required, to consider all the circumstances surrounding a purchaser's acquisitions, including factors such as transportation costs, distribution facilities, customer inventory, or any other factor that could limit the purchaser to a specific area. If sellers of a product within a given geographic area can increase price or cut production without a prompt flow of supply from other sources into the area, those sellers are operating in a separate geographic market.[4] This determination is singularly one for the jury.

The jury in the case *sub judice* in a three week trial received evidence from both parties regarding the factual basis for a geographic market. RCM's expert testified that the Washington market constituted an area of effective competition and, at least in economic terms, was a proper geographic market. The HDI expert, while refusing to acknowledge that RCM and HDI were competitors, conceded that if they were, the Washington area market would be appropriate. There also was evidence presented to the jury that the "commercial realities" of the aluminum siding industry caused manufacturers to enter and make siding available to some areas and not to others, and that except by having a presence in a regional market by a regional distribution center or through a major independent distributor, manufacturers did not compete in regional markets. For example, HDI conceded that it was not present in the Balti-

more market because it did not have a regional distribution center. Also, the jury could have viewed HDI's own arrangements with its customers as evidence of the regional character of the market. Despite the fact that HDI's largest customer, Ryan Homes, was a national builder, Ryan did not purchase from HDI on a national basis and HDI did not compete for Ryan's business on a national basis. In my view, the evidence presents a classic jury issue. Concededly, this issue is not as simple to define as are the factual issues arising from the average automobile traffic accident. Antitrust issues by and large are complex and trial courts are truly tested in instructing juries on how to apply legal principles to the proven facts. The trial court in the case *sub judice* met that test admirably, and the district court instructed the jury clearly, simply and correctly. Unless we are to require judicial fact determination rather than jury fact determination on the basis of complexity, we must respect such jury verdicts.[5]

### III.

I would likewise affirm that portion of the judgment awarding RCM $34,966.00 for "malicious interference with business relations."

The majority correctly notes that under the applicable Maryland law defendants in this common law action have a privilege to commercially compete and that proper commercial competition is a defense to a claim of malicious interference. I cannot agree with my brethren on this panel, however, that the jury was not correctly instructed concerning this defense.

---

3. *Brown Shoe Co.*, of course, arose under § 7 of the Clayton Act. Although the majority, without comment, dismisses cases arising under § 7 as distinguishable, there is a substantial body of both case law and commentary to the contrary. *See, e.g.,* van Kalinowski, Market Definition Under Section 2. The Applicability of Clayton Act Section 7 Analysis, 10 Sw.L. Rev. 95 (1978); *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

4. Sullivan, *supra*, at 67.

5. Because the majority finds that there was no showing of a relevant geographic market, it did not reach the issue of relevant product market. I note, however, that the jury was properly instructed on the definition of relevant product market, and heard evidence that only vinyl and steel were interchangeable with aluminum siding for product market purposes. The jury's finding was not unreasonable or against the clear weight of the evidence.

The jury was instructed that RCM was required to prove four elements: (1) that HDI acted willfully and intentionally, (2) that the acts were calculated to cause damage to RCM's lawful business pursuits, (3) that the acts were done with the unlawful purpose of causing loss or damage to RCM's business and were undertaken without just cause and (4) that RCM was damaged.

Under this instruction it seems apparent that HDI's competition privilege is protected, since RCM is required to prove that HDI's actions were "undertaken without just cause." The instruction itself is in perfect accord with Maryland law on malicious interference. *Beane v. McMullen*, 265 Md. 585, 291 A.2d 37 (1972). As *Beane* points out, it is the "without just cause" component which is the "malicious" component of malicious interference, and it is the existence of malice which negates qualified privileges to interfere with another's business relations.

Therefore, I must respectfully dissent.