**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

E. I. DU PONT DE NEMOURS AND
COMPANY,

        *Plaintiff-Appellee,*

        v.

KOLON INDUSTRIES, INCORPORATED,

        *Defendant-Appellant,*

        and

KOLON USA, INCORPORATED,

        *Defendant,*

        v.

MICHAEL D. MITCHELL; ARAMID
FIBER SYSTEMS, LLC,

        *Third Party Defendants.*

No. 10-1103

UNITED STATES OF AMERICA;
FEDERAL TRADE COMMISSION,

        *Amici Supporting Appellant.*

E. I. Du Pont de Nemours and Company,

> *Plaintiff-Appellee,*

v.

Kolon Industries, Incorporated,

> *Defendant-Appellant,*
>
> and

Kolon USA, Incorporated,

> *Defendant,*

v.

Michael D. Mitchell; Aramid Fiber Systems, LLC,

> *Third Party Defendants.*

United States of America; Federal Trade Commission,

> *Amici Supporting Appellant.*

No. 10-1275

Appeals from the United States District Court for the Eastern District of Virginia, at Richmond. Robert E. Payne, Senior District Judge. (3:09-cv-00058-REP)

Argued: October 26, 2010

Decided: March 11, 2011

Before KEENAN and WYNN, Circuit Judges, and Bobby R. BALDOCK, Senior Circuit Judge of the United States Court of Appeals for the Tenth Circuit, sitting by designation.

Reversed by published opinion. Judge Wynn wrote the opinion, in which Judge Keenan and Senior Judge Baldock joined.

---

## COUNSEL

**ARGUED:** Stephen Blake Kinnaird, PAUL HASTINGS JANOFSKY & WALKER, LLP, Washington, D.C., for Appellant. Nickolai Gilford Levin, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Supporting Appellant. Howard Feller, MCGUIREWOODS, LLP, Richmond, Virginia, for Appellee. **ON BRIEF:** Michael P. A. Cohen, PAUL HASTINGS JANOFSKY & WALKER, LLP, Washington, D.C.; Dana J. Finberg, LECLAIRRYAN, Richmond, Virginia, for Appellant. Willard K. Tom, General Counsel, FEDERAL TRADE COMMISSION, Washington, D.C.; Christine A. Varney, Assistant Attorney General, Catherine G. O'Sullivan, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amici Supporting Appellant. Kristen M. Calleja, MCGUIREWOODS, LLP, Richmond, Virginia; Shari Ross Lahlou, CROWELL & MORING, LLP, Washington, D.C., for Appellee.

---

## OPINION

WYNN, Circuit Judge:

Under the Sherman Act, a plaintiff making monopoly and attempted monopoly claims must allege a relevant geographic market to help the court determine whether the defendant has monopoly power. In this case, the district court held that Supreme Court precedent required including in the relevant geographic market definition all locations where product suppliers are headquartered. Yet the Supreme Court case upon which the district court relied, *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320 (1961), requires no such thing.

Rather, it requires that courts consider, in defining the relevant geographic market, where sellers operate *and* where purchasers can predictably turn for supplies. If U.S. consumers can predictably turn to supplies only in the United States, then the United States is the relevant geographic market. Because that is what Kolon Industries Incorporated alleged here, the district court erred in dismissing its counterclaim for failure to sufficiently plead a relevant geographic market.

I.

This is a case about whether E.I. du Pont de Nemours and Company ("DuPont") attempted to wield, and did wield, monopoly power over the U.S. para-aramid fiber market in violation of Section 2 of the Sherman Act. Para-aramid fibers are strong, complex synthetic fibers used to make, among other things, body armor, tires, and fiber optic cables. Three para-aramid producers—American DuPont, Dutch Teijin, and Korean Kolon—sell their para-aramid fibers to U.S. consumers. Other para-aramid producers exist but do not sell into the U.S. market. DuPont is the unquestioned industry leader in the U.S. para-aramid market. Indeed, for many years, DuPont was the only para-aramid producer in the U.S. market, and it currently sells over 70 percent of the para-aramid fibers purchased in the United States.

In February 2009, DuPont brought a trade secrets suit against Kolon, a relative newcomer to para-aramid production. Kolon counterclaimed that DuPont had monopolized and had attempted to monopolize the para-aramid market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.[1] The primary thrust of Kolon's second amended counterclaim ("Counterclaim") is that DuPont illegally used multi-year supply agreements with high-volume para-aramid fiber custom-

---

[1] Kolon counterclaimed under Section 16 of the Clayton Act, 15 U.S.C. § 26, "to prevent and restrain violations of Section 2 of the Sherman Act." [J.A. 554]

ers. Those agreements required high-volume customers to purchase 80 to 100 percent of their para-aramid requirements from DuPont. Kolon alleged that those agreements removed substantial commercial opportunities from competition and limited other para-aramid fiber producers' ability to compete.

DuPont moved, under Federal Civil Procedure Rule 12(b)(6), to dismiss Kolon's Counterclaim. The district court granted that motion on December 18, 2009, on the bases that: (a) Kolon inadequately pled the relevant geographic market within which competition for para-aramid fibers takes place; and (b) Kolon failed to plead adequately unlawful exclusionary conduct on the part of DuPont. *E.I. Du Pont De Nemours & Co. v. Kolon Indus., Inc.*, 683 F. Supp. 2d 401 (E.D. Va. 2009). The district court allowed Kolon to amend, but Kolon declined in favor of an immediate appeal. The district court therefore entered a final judgment against Kolon under Civil Procedure Rule 54(b).

## II.

We review de novo the district court's grant of DuPont's motion to dismiss. *Sucampo Pharm., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006). When ruling on a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To survive the motion, a complaint (or counterclaim, as is the case here) must contain sufficient facts to state a claim that is "plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Nevertheless, a complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman v. Md. Ct. of Apps.*, 626 F.3d 187, 190 (4th Cir. 2010) (internal quotation marks omitted). Further, "like the district court, [we] draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009).

### III.

Kolon contends that DuPont violated Section 2 of the Sherman Act through its use of exclusive contracts with high-volume para-aramid customers. Under Section 2, "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person . . . to monopolize any part of the trade" is guilty of an offense and subject to penalties. 15 U.S.C. § 2. To prove a Section 2 monopolization offense, a plaintiff must establish two elements: (1) the possession of monopoly power; and (2) willful acquisition or maintenance of that power—as opposed to simply superior products or historic accidents. *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 480 (1992); *Cavalier Tel., LLC v. Verizon Va., Inc.*, 330 F.3d 176, 183 (4th Cir. 2003). An attempted monopolization offense consists of: (1) the use of anticompetitive conduct; (2) with specific intent to monopolize; and (3) a dangerous probability of success. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993); *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 147 (4th Cir. 1990).

To run afoul of Section 2, a defendant must be guilty of illegal conduct "to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482-83 (internal quotation marks omitted). Conduct that might otherwise be lawful may be impermissibly exclusionary under antitrust law when practiced by a monopolist. Indeed, "a monopolist is not free to take certain actions that a company in a competitive . . . market may take, because there is no market constraint on a monopolist's behavior." *LePage's, Inc. v. 3M*, 324 F.3d 141, 151-52 (3d Cir. 2003) (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601-04 (1985)). And although not per se illegal, exclusive dealing arrangements can constitute an improper means of acquiring or maintaining a monopoly. *See, e.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 576 (1966); *Tampa Electric*, 365 U.S. at 324, 327; *United States v. Micro-*

*soft Corp.*, 253 F.3d 34, 70-71 (D.C. Cir. 2001); *Advanced Health-Care Servs.*, 910 F.2d at 142, 148-49.

In analyzing Sherman Act Section 2 claims such as the ones Kolon makes here, courts begin with a preliminary inquiry into market definition, which serves as a tool to determine the defendant's market power. *See Consul, Ltd. v. Transco Energy Co.*, 805 F.2d 490, 493-95 (4th Cir. 1986). The market definition has two components—the relevant product market and the relevant geographic market. *Id*. at 493; *RCM Supply Co., Inc. v. Hunter Douglas, Inc.*, 686 F.2d 1074, 1076 (4th Cir. 1982). Generally, in a Section 2 case, a plaintiff must allege both as a threshold matter. *Id*.; *Consul*, 805 F.2d at 493-95. Here, the parties do not dispute the relevant product market, which is the para-aramid fiber market. The disagreement here centers on the relevant geographic market.

The relevant geographic market inquiry focuses on that geographic area within which the defendant's customers who are affected by the challenged practice can practically turn to alternative supplies if the defendant were to raise its prices or restrict its output. William C. Holmes, *Antitrust Law Handbook* § 3:4 (West 2009); *see also* Herbert Hovenkamp, *Federal Antitrust Policy* § 3.6 (West 2005) ("The relevant geographic area for antitrust purposes is some geographic area in which a firm can increase its price without 1) large numbers of its customers quickly turning to alternative supply sources outside the area; or 2) producers outside the area quickly flooding the area with substitute products."). Courts consider, in this context, the availability—or lack thereof—of alternative supplies to which a consumer might practically turn because alternative supplies constrain an alleged monopolist's ability to raise prices or exclude competition. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1336-37 (7th Cir. 1986).

The standard for determining the relevant geographic market announced in *Tampa Electric*[2] has been paraphrased as follows:

> [T]he geographic market should consist of an area in which the Defendants operate and which the Plaintiff can reasonably turn to for supplies. If you determine that, as a practical matter, [Plaintiff] can only turn for supplies or purchase their relevant [supplies] in [a narrowly defined] market, then that market is the geographic market for Section 2 purposes. On the other hand, if you determine that [Plaintiff] could turn for supplies in an area broader than the [narrowly defined] market, then the larger market would be the geographic market for Section 2 purposes.

*RCM Supply*, 686 F.2d at 1077 (quoting, with approval, district court's jury instructions and expressly recognizing them as "aptly" paraphrasing *Tampa Electric*'s standard for determining relevant geographic market); *see also Consul*, 805 F.2d at 495 ("The formulation approved by this court in *RCM Supply* is helpful: the geographic market should consist of *an area in which the defendants operate and which the plaintiff can reasonably turn to for supplies*.") (internal quotation marks omitted).

As the *RCM Supply* jury instructions suggest, "'market definition is a question of fact. . . .'" *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196

---

[2]The complaint in *Tampa Electric* raised claims under the Sherman Act, 15 U.S.C. § 1 and the Clayton Act, 15 U.S.C. § 12. The Supreme Court's analysis addressed only the Clayton Act claims and then stated that, because the conduct at issue did not run afoul of the Clayton Act, it also was not forbidden by the Sherman Act. *Tampa Electric*, 365 U.S. at 335. *Tampa Electric*'s relevant geographic market framework is applied routinely in Sherman Act cases. *See, e.g.*, *Consul*, 805 F.2d at 495; *RCM Supply*, 686 F.2d at 1076-77; *Am. Football League v. Nat'l Football League*, 323 F.2d 124, 129 (4th Cir. 1963).

(1st Cir. 1996) (quoting *Weiss v. York Hosp.*, 745 F.2d 786, 825 (3d Cir. 1984)); *see also, e.g.*, *Oahu Gas Serv., Inc. v. Pac. Res., Inc.*, 838 F.2d 360, 363 (9th Cir. 1988) ("Our previous decisions establish that both market definition and market power are essentially questions of fact."); *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1220 (10th Cir. 1986) ("We recognize that market definition is a question of fact . . . ."); *Heatransfer Corp. v. Volkswagenwerk, A.G.*, 553 F.2d 964, 979 (5th Cir. 1977) ("Relevant market is essentially a question of fact . . . ."). This makes sense, given that determining the relevant geographic market is a fact-intensive exercise centered on the commercial realities of the market and competition. *See, e.g.*, *Eastman Kodak*, 504 U.S. at 453 ("The proper market definition in this case can be determined only after a factual inquiry into the 'commercial realities' faced by consumers."); *Todd v. Exxon Corp.*, 275 F.3d 191, 199 (2d Cir. 2001) (Sotomayor, J.) (noting that "market definition is a deeply fact-intensive inquiry").

The commercial realities considered when defining the relevant geographic market include: where the parties market their products; the size, cumbersomeness, and perishability of the products; regulatory requirements impeding the free flow of competing goods into or out of the area; shipping costs and limitations; the area within which the defendant and its competitors view themselves as competing; and other factors bearing upon where customers might realistically look to buy the product. *See, e.g.*, *Antitrust Law Handbook* § 3.4; *RCM Supply*, 686 F.2d at 1077; *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744-45 (5th Cir. 2010); *L.A. Draper & Son v. Wheelabrator-Frye, Inc.*, 735 F.2d 414, 423 (11th Cir. 1984).

The Supreme Court has noted that "although the geographic market in some instances may encompass the entire Nation, under other circumstances it may be as small as a single metropolitan area." *Brown Shoe Co. v. United States*, 370 U.S. 294, 337 (1962). Therefore, in *Brown Shoe*, a Clayton Act case, the geographic market was properly limited to cities

of a certain size where two shoe companies sold goods. *Id*. Similarly, this Circuit has stated that "the relevant market has been found to be a single city, a group of cities, a state, or several states." *Am. Football League*, 323 F.2d at 129 (footnotes omitted).

Consequently, dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic. As then-Judge, now-Justice Sotomayor noted in *Todd*:[3]

> Because market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss for failure to plead a relevant product market. *See Found. for Interior Design Educ. Research v. Savannah Coll. of Art & Design*, 244 F.3d 521, 531 (6th Cir. 2001) ("Market definition is a highly fact-based analysis that generally requires discovery.") (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 482, 112 S. Ct. 2072, 119 L.Ed.2d 265 (1992)); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998) (noting that "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery"); *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) (explaining that "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers") (citing *Eastman Kodak*, 504 U.S. at 482, 112 S. Ct. 2072); *cf. Hayden Publ'g Co. v. Cox Broad. Corp.*, 730 F.2d 64, 70 n.8 (2d Cir. 1984) ("The conclusion that genuine issues of material fact preclude a finding as to [the] relevant market as a matter of law is not unex-

---

[3]While *Todd* focused on relevant product market definition, the Supreme Court has recognized that "[t]he criteria to be used in determining the appropriate geographic market are essentially similar to those used to determine the relevant product market." *Brown Shoe*, 370 U.S. at 336.

pected. It frequently has been observed that 'a pronouncement as to market definition is not one of law, but of fact . . . .' ") (citations and alterations omitted). There is, however, no absolute rule against the dismissal of antitrust claims for failure to allege a relevant product market. *Queen City*, 124 F.3d at 436.

\* \* \*

Cases in which dismissal on the pleadings is appropriate frequently involve either (1) failed attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes or (2) failure even to attempt a plausible explanation as to why a market should be limited in a particular way.

*Todd*, 275 F.3d at 199-200 (footnotes omitted) (reversing district court's dismissal of the complaint, which pled a relevant market).

Stated differently, "dismissals at the pre-discovery, pleading stage remain relatively rare and are generally limited to" certain types of "glaring deficiencies," such as failing to allege a relevant market. *Allen v. Dairy Farmers of Am., Inc.*, No. 5:09-cv-230, ___ F. Supp. 2d ___, ___ (D. Vt. 2010) (stating that dismissals are "generally limited to instances in which the complaint either: (1) fails to allege a geographic market or the boundaries of a relevant geographic market; (2) defines a geographic market in an unreasonably and implausibly narrow manner; or (3) alleges a contradictory and vague delineation of the relevant geographic market. Here, none of those glaring deficiencies are present in the Amended Complaint. As a result, the proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by consumers." (internal quotation marks and citations omitted)).

In this case, Kolon pled that the relevant geographic market was "worldwide supply of para-aramid fiber to commercial purchasers in the United States."[4] [J.A. 561] Kolon also pled that: the U.S. para-aramid market is distinct from other markets; prices are high while supply is low; some foreign manufacturers do not sell their para-aramid fibers to U.S. consumers; high technical and legal barriers to the U.S. para-aramid market exist; and DuPont dominates the market through the use of essentially exclusive multi-year contracts.

In other words, Kolon pled that the United States functions as a distinct market for para-aramid fibers. Further, Kolon pled market realities that could have led to the United States' being a distinct market—that is, technical, legal, and other barriers to entry, as well as DuPont's anticompetitive con-

---

[4]Paragraph 24 of the Counterclaim states:

> The relevant geographic market is worldwide supply of para-aramid fiber to commercial purchasers in the United States. The geographic market includes foreign supply practicably available to U.S. commercial purchasers, but the extent and nature of that supply is not known and will have the be determined on a factual record. Competition for U.S. commercial para-aramid buyers occurs in the United States where the buyers are located. Many U.S. buyers require particular qualification analysis and tests for their specific commercial uses. And prices in the United States are distinct from other nations. There are only five global producers of para-aramid fiber. DuPont is the only domestic producer. Teijin is the only other supplier to U.S. commercial customers, but the amount of its supply and shipments to the United States for commercial use are not known. Its capacity to divert production for supply to United States commercial customers also is not known. Accordingly, the extend of its production that should be included in the market definition and market share calculations must be left for factual determination. Kolon is the only other manufacturer that supplies commercial customers in the United States, and its sales to date are de minimis. Kamenskvolokno and Yenta Spandex do not supply commercial customers or otherwise ship para-aramid fiber into the United States.

[J.A. 561]

tracts with key para-aramid consumers. Kolon therefore pled a plausible, distinct relevant geographic market. Indeed, even the district court recognized that Kolon pled that U.S. consumers "have considerable difficulty in turning to the products of foreign manufacturers," that Kolon gives "specific reasons" for these difficulties, and that this and "other commercial realities" "mitigate[] [sic] toward the plausibility of Kolon's proposed market definition." [J.A. 730-32]

The district court nevertheless concluded that "[t]he market, per *Tampa Electric*, . . . must be expanded to include the areas where the sellers operate," apparently without regard to whether U.S. consumers of para-aramid fibers can practicably turn to supplies in those places. [J.A. 740] Consequently, the district court held:

> Kolon cannot acknowledge, on the one hand, that Teijin and Kolon sell to American customers while, on the other hand, excluding those countries from the geographic market. Thus, the minimum plausible geographic market for Kolon's allegations must include the Netherlands, where Teijin is headquartered, and Korea, where Kolon is headquartered.[5]

[J.A. 740-41] The district court so concluded with no information before it, on DuPont's Rule 12(b)(6) motion, about what para-aramid fiber supplies exist in those headquarter countries or the extent to which the presumed supplies in those countries could be diverted to U.S. consumers. As a matter of fact, the district court deemed such commercial realities irrelevant: "Even if there is considerable evidence[6] that

---

[5]At other points in its opinion, the district court also refers to the necessity of including in the relevant geographic market those places where sellers "operate" and "produce." [J.A. 739-741]

[6]The district court's use of the word "evidence" in this context underscores the district court's failure to adhere to the strict standards of what may be considered—the Counterclaim—and who benefits from the inferences drawn therefrom—the non-movant—on a Rule 12(b)(6) motion. This problem is addressed in some detail below.

much of Kolon's supply is not practically available to consumers in the United States, the wisdom of Landes & Posner . . . counsels the Court to include *all* of Kolon's sales to all markets within the relevant geographic market for this case." [J.A. 739]

The district court reached this conclusion despite the fact that no federal appellate court has held that supplier headquarter sites must, as a matter of law, be included in the relevant geographic market definition in Sherman Act cases. The district court instead relied on a 1981 law review article—William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981).[7] Landes and Posner posited that

> if a distant seller has some sales in a local market, *all* its sales, wherever made, should be considered a part of that local market for purposes of computing the market share of a local seller. This is because the distant seller has proved its ability to sell in the market and could increase its sales there, should the local price rise, simply by diverting sales from other markets.

*Id.* at 963.

As the district court itself recognized, however, the "model proposed by Landes and Posner is less persuasive when exclusive dealing arrangements are alleged. When a 'distant seller' (*id.*) is prevented from effectively competing in the American market by anticompetitive conduct, the anticompetitive actor's exclusive deals prevent the distant seller from injecting a rapid influx of competing product in response to a price increase." [J.A. 739] That is precisely what Kolon alleged in its Counterclaim.

---

[7]While we otherwise would hesitate to give such extensive treatment to a law review article, we do so here because the district court heavily relied on this one in granting DuPont's motion to dismiss.

Further, Landes's and Posner's model, by its own terms, applies only to suppliers with "nonnegligible sales in the market for a continuous period of several years. This is necessary to deal with the case where distant sellers make sporadic or insignificant sales in the market in question . . . ." Landes & Posner, *supra*, at 967. Kolon pled that its sales constituted only .87 percent of the U.S. para-aramid market and that Kolon had been in the market since only 2006. Even Landes and Posner would therefore almost surely not include Korea in Kolon's relevant geographic market. And Landes and Posner also made clear that "[s]ometimes a foreign product will . . . reach just one of the coasts of the United States (the west coast, for Japanese and other Asian producers; the east coast, for European producers); domestic U.S. transportation costs will prevent it from reaching the interior markets of the United States or the other coast. These sellers should not be included in measuring the market power of firms selling to the interior markets or the other coast." *Id.* That caveat could rule both Dutch Teijin and Korean Kolon out of the relevant geographic market.[8]

---

[8]Moreover, the Landes and Posner article has been the target of considerable criticism for its failure to take into account commercial realities in international trade cases. *See, e.g.*, Robert Pitofsky, *New Definitions of Relevant Market and the Assault on Antitrust*, 90 Colum. L. Rev. 1805, 1857-59 (1990); Timothy J. Brennan, *Mistaken Elasticities and Misleading Rules*, 95 Harv. L. Rev. 1849, 1849 (1982); Louis Kaplow, *The Accuracy of Traditional Market Analysis and a Direct Adjustment Alternative*, 95 Harv. L. Rev. 1817, 1835-48 (1982). Its critics warned that Landes's and Posner's "logic is applicable in only the rarest of cases," Kaplow, *supra*, at 1836, and "may lead to faulty estimates of market power." Brennan, *supra*, at 1849. For example, Landes and Posner indicated that their logic "holds only if the foreign and domestic products are perfectly identical." Landes & Posner, *supra*, at 965. But "[m]ost products do vary somewhat across brands, at least as perceived by consumers. Ordinarily, antitrust analysis treats substantially similar products as though they were identical, because any error thereby introduced is insignificant. But with Landes and Posner's rule for geographical market definition, the resulting error is overwhelming, because even modest imports dictate the inclusion of all foreign production." Kaplow, *supra*, at 1836 (footnote omitted). Further, Landes and Posner were criticized for failing to account for, among other things, foreign suppliers' difficulties in diverting potential alternative supplies, transportation and tariff costs, and other barriers to importation. *See, e.g.*, Brennan, *supra* at 1849-50.

Regardless of Landes's and Posner's construct, in *RCM Supply*, our paraphrasing of *Tampa Electric*'s standard makes plain that this Circuit does not interpret *Tampa Electric* to require suppliers' headquarter locations to be included in relevant market definition without regard to whether consumers can actually turn to those places for supplies. *RCM Supply*, 686 F.2d at 1077. In fact, the *RCM Supply* jury was instructed to find the relevant geographic market to be the Washington, D.C. area if it found that RCM could practically turn only to supplies in that area. *Id.* The jury was further instructed that, to determine to what area "RCM can practically turn for supplies, you should consider whether there are any differences in transportation costs, distribution facilities, customer inventory or any other factor that would cause the Plaintiff to turn to the suppliers solely within" the Washington area. *Id.* That is, one must look at the commercial realities to define the relevant market.

Similarly, in *United States v. Pabst Brewing Co.*, 384 U.S. 546, 548 (1966), a Clayton Act case, the Supreme Court approved of a geographic market for beer sales that was limited to Wisconsin or a tri-state area of Wisconsin, Illinois, and Michigan—even though a significant portion of the beer sold in Wisconsin was brewed elsewhere. *See United States v. Pabst Brewing Co.*, 233 F. Supp. 475, 481 (E.D. Wisc. 1964), *rev'd*, 384 U.S. 546 (noting that "beer was sold in Wisconsin by 69 breweries" but only "38 breweries were operated in that state").

Further, in *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 184, 187-88 (3d Cir. 2005), the Third Circuit accepted a relevant market definition of "the sale of prefabricated artificial teeth in the United States." The government's complaint in *Dentsply*, similar to Kolon's Counterclaim here, alleged that Dentsply, which held a 75- to 80-percent market share, stifled artificial tooth competition, including through the use of exclusive agreements. *Id.* at 184. Some of the other manufacturers of prefabricated artificial teeth who sold into the

U.S. market—such as "Vita Zahnfabrik" and "Heraeus Kulzer GmbH"—would seem to be foreign. *Id*. Nonetheless, the relevant market was confined to all prefabricated artificial teeth sales in the United States. *Id*.

*RCM Supply, Brown Shoe*, *Pabst Brewing, Dentsply*, and other cases[9] demonstrate that, in defining the relevant geographic market in an antitrust case, plaintiffs are not required to include supplier headquarter or other sites without regard to whether consumers can predictably turn to those places for supply. And *Tampa Electric* neither held nor implied any such requirement.

Here, Kolon pled a relevant geographic market—the United States. Further, Kolon pled plausible reasons for limiting the geographic market to the United States. Kolon therefore cleared the hurdle of pleading a plausible relevant geographic market. Whether Kolon's proffered relevant geographic market definition will hold up upon a fact-intensive inquiry remains to be seen. But dismissing Kolon's Counterclaim on its face was error.

Nonetheless, DuPont attempts to preserve its 12(b)(6) victory by comparing the inadequate complaint in *Twombly*, 550 U.S. 544, to Kolon's Counterclaim here. But this case is no *Twombly*. In *Twombly*, the class-action plaintiffs brought an antitrust conspiracy claim but then failed to allege a conspiracy, i.e., an illegal agreement, instead alleging merely parallel business conduct. *Twombly*, 550 U.S. 544. Here, in contrast, Kolon unquestionably alleged a relevant geographic market.

---

[9]*See, e.g.*, *United States v. Columbia Steel Co.*, 334 U.S. 495 (1948) (considering the supply of steel products that producers located outside the relevant geographic area supplied to consumers within the area); *In re Polypore Int'l, Inc.*, Case No. 9327, 2010 WL 866178 (F.T.C. Mar. 1, 2010) (limiting relevant geographic market to North America despite respondent's having manufacturing sites in the United States as well as in Austria, Thailand, China, India, France, and Italy).

As the record shows, Kolon alleged a distinct U.S. market and then explained why it was so.

DuPont further contends that Kolon's Counterclaim must fail because of the Berry Amendment, which generally prohibits the Department of Defense from buying supplies from foreign producers such as Kolon. *See* 10 U.S.C. § 2533a. However, the extent to which DuPont's dominant market position can be attributed to the Berry Amendment—something the district court attempted to analyze by inappropriately going beyond the Counterclaim—cannot be determined at the motion-to-dismiss stage. Further, Kolon's Counterclaim restricts its market definition to commercial purchasers. Under these circumstances, dismissal was inappropriate.

Finally, DuPont contends that, according to the U.S. Department of Justice's and Federal Trade Commission's Horizontal Merger Guidelines, considering foreign supply into the U.S. market while limiting the relevant geographic market to the United States is appropriate only where price discrimination is alleged. DuPont argues that, because Kolon did not use the phrase "price discrimination" in its Counterclaim, Kolon made no such allegation.

DuPont cites no binding authority for either the proposition that such a market definition is permissible only where price discrimination is alleged or the proposition that the specific words "price discrimination" must be used to allege price discrimination. *See United States v. Dean Foods Co.*, Case No. 10-CV-59, 2010 WL 1417926, at *5 (E.D. Wis. April 7, 2010) (holding that plaintiff was not required "to include magic words in order to survive a motion to dismiss" when claiming defendant's ability to price-discriminate—i.e., impose a small but significant and nontransitory increase in price on customers unable to turn to alternative supply).

Meanwhile, Kolon pled that DuPont dominated the U.S. para-aramid market, that U.S. para-aramid consumers pay

more than consumers elsewhere, but that, despite high prices, para-aramid fiber supply in the United States remains low. These allegations suggest price discrimination that would support Kolon's contention that DuPont possessed sufficient market power such that it was a monopolist. *See, e.g.*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 783 (7th Cir. 1999) ("Price discrimination implies market power, that is, the power to charge a price above cost (including in 'cost' a profit equal to the cost of equity capital) without losing so much business so fast to competitors that the price is unsustainable.").

In sum, Kolon pled a distinct relevant geographic market and provided numerous reasons for defining the market as it did. Kolon's plausible relevant geographic market was sufficient to withstand a Rule 12(b)(6) motion to dismiss, and the district court erred in holding otherwise.

## IV.

The district court also concluded that Kolon failed to adequately plead anticompetitive conduct. Kolon contends that this determination rested on information inappropriately considered on a motion to dismiss and on inferences in DuPont's, instead of Kolon's, favor. We agree.

### A.    Facts And Inferences On DuPont's Motion To Dismiss

When ruling on a Rule 12(b)(6) motion to dismiss, "a judge must accept as true all of the factual allegations contained in the complaint." *Erickson*, 551 U.S. at 94. *See also Advanced Health-Care Servs.*, 910 F.2d at 147 ("The factual allegations of the plaintiff with respect to the relevant markets and the defendants' market shares must be accepted as true at this point."). The complaint "need only give the defendant fair notice of what the claim is and the grounds upon which it rests." *Coleman*, 626 F.3d at 190 (internal quotation marks

omitted). And "all reasonable inferences" must be drawn in favor of the complainant. *Nemet Chevrolet*, 591 F.3d at 253.

In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (stating that "a court may consider [a document outside the complaint] in determining whether to dismiss the complaint" where the document "was integral to and explicitly relied on in the complaint" and there was no authenticity challenge). However, the district court cannot go beyond these documents on a Rule 12(b)(6) motion; if it does, it converts the motion into one for summary judgment. Fed. R. Civ. P. 12(b), 12(d), 56. Such conversion is not appropriate where the parties have not had an opportunity for reasonable discovery. *Gay v. Wall*, 761 F.2d 175, 178 (4th Cir. 1985) ("Because Gay was not afforded an opportunity for reasonable discovery, the district court's treatment of the motion to dismiss as a motion for summary judgment was an abuse of discretion.").

Additionally, statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion. *Dolgaleva v. Va. Beach City Pub. Sch.*, 364 F. App'x 820, 825 (4th Cir. 2010) (citing *Hamm v. Rhone-Poulenc Rorer Pharms.*, Inc., 187 F.3d 941, 948 (8th Cir. 1999)); *cf. Smith v. Local No. 25, Sheet Metal Workers Int'l Ass'n*, 500 F.2d 741, 744-45 (5th Cir. 1974) (treating a Rule 12(b)(6) dismissal order as converted into summary judgment because district court relied on materials outside the pleadings, including oral argument). In *Dolgaleva*, rather than considering only the face of the complaint, the district court allowed the defendant to dispute allegations during a hearing. The district court then improperly dismissed the complaint based on statements the defendant made at the hearing. *Dolgaleva*, 364 F. App'x at 825-26. (citing *Lee v.*

*City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (finding error where the district court "assumed the existence of facts that favor defendants based on evidence outside plaintiffs' pleadings, [and] took judicial notice of the truth of disputed factual matters")).

Similarly, in this case, the district court went beyond Kolon's Counterclaim in ruling on DuPont's motion to dismiss. The district court relied upon a statement made by DuPont's counsel during oral argument that "Kolon had access to all of DuPont's relevant supply agreements during the time period in question." [J.A. 712] The district court reiterated several times that "DuPont asserts that these are the only supply agreements relevant to Kolon's claims" and that "DuPont has affirmed, at oral argument in open court, that it has disclosed all supply agreements pertinent to Kolon's claims." [J.A. 745-46] The district court then made plain that it accepted the statement as true and would evaluate Kolon's complaint in light thereof: "These documents, in essence, *are* Kolon's case for anticompetitive conduct." [J.A. 747]

Similarly, the district court stated:

> The Court will not view these supply agreements as it would the entirety of both parties' evidence at summary judgment. But, DuPont has affirmed, at oral argument in open court, that it has disclosed all supply agreements pertinent to Kolon's claims. Thus, the legal sufficiency of Kolon's allegations depends upon whether its claims of market exclusion are plausible given the substance of the supply agreements.

[J.A. 745] The problem: Kolon never suggested in its Counterclaim that it had received all of DuPont's contracts relevant to Kolon's antitrust claims. And it would surely have been difficult for Kolon to know whether it had all relevant DuPont

contracts given that nothing in the record indicates that full discovery had been undertaken.[10]

Nevertheless, the district court's anticompetitive conduct analysis is riddled with reliance on DuPont's statement about the contracts. For example, the district court stated that "DuPont has executed supply agreements, covering various periods from 2006 through the end of 2010, with four of its top twelve customers. . . . [T]his percentage does not allow for a plausible claim of substantial foreclosure." [J.A. 738] In analyzing DuPont's market share for which Kolon was prevented from competing, the district court assumed only four anticompetitive contracts—i.e., that four of DuPont's top twelve customers were constrained from buying Kolon's or other DuPont competitors' products. On that basis, the district court calculated an overall market foreclosure percentage of less than 25 percent and held that such a low percentage was not enough to have a significant effect on competition in violation of the Sherman Act.

We hold that the district court erred in accepting statements beyond the Counterclaim and making inferences on that basis in favor of DuPont. And because the record indicates that the parties had not yet had the opportunity to conduct reasonable discovery, converting the motion to dismiss to one for summary judgment, where such statements, if appropriately presented, could be considered, would have been error. *See Gay*, 761 F.2d at 178 ("Because Gay was not afforded an opportunity for reasonable discovery, the district court's treatment of the motion to dismiss as a motion for summary judgment was an abuse of discretion.").

---

[10]Indeed, Kolon objected that DuPont's statements "ha[d]n't been tested by discovery. They are just standing up here, making representations about the facts that we've had absolutely no ability to get." [J.A. 667] Kolon's counsel underscored that "[w]e have gotten a self-selected set of discovery that was not given to us under any compulsory discovery. We still haven't gotten compulsory discovery. We don't know whether or not their self-representation . . . is correct." [J.A. 668]

It remains for us to determine whether the district court's error was harmless. Where a district court errs in going beyond the complaint on a Rule 12(b)(6) motion, the error is harmless if the complaint would not have withstood the motion to dismiss on its face. *Dolgaleva*, 364 F. App'x at 826. Stated differently, we can affirm the dismissal of the complaint "on any basis fairly supported by the record." *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 222 (4th Cir. 2002). We therefore look to Kolon's Counterclaim to determine whether Kolon sufficiently pled its two Sherman Act claims, taking Kolon's allegations as true and making all reasonable inferences in its favor. *See Erickson*, 551 U.S. at 94; *Nemet Chevrolet*, 591 F.3d at 253.[11]

B. Kolon's Monopolization Claim

As stated earlier, a monopolization violation consists of two elements: (1) the possession of monopoly power in the relevant market, and (2) willful maintenance of that power. *Eastman Kodak*, 504 U.S. at 480; *Cavalier Tel.*, 330 F.3d at 183. To violate Section 2, a defendant must engage in conduct "to foreclose competition, gain a competitive advantage, or to destroy a competitor." *Eastman Kodak*, 504 U.S. at 482-83 (internal quotation marks omitted).

As to the first element, possession of monopoly power, this Court has previously noted that "when monopolization has been found the defendant controlled seventy to one hundred per cent of the relevant market." *White Bag Co. v. Int'l Paper Co.*, 579 F.2d 1384, 1387 (4th Cir. 1974) (citations omitted). *See also, e.g.*, *Dentsply*, 399 F.3d at 188 (noting that Dentsply "has had a persistently high market share between 75% and 80% on a revenue basis, in the artificial tooth market" and holding that "Dentsply's share of the market is more than ade-

---

[11]The United States, as amicus curiae, requested that the case be remanded to the district court for application of the correct standard in determining the adequacy of the geographic market allegation.

quate to establish a prima facie case of power") (internal quotation marks omitted); *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 489 (5th Cir. 1984) ("Supreme Court cases, as well as cases from this court, suggest that absent special circumstances, a defendant must have a market share of at least 50 percent before he can be guilty of monopolization."). Further, some courts have also focused on the durability of the defendant's market power, particularly with an eye toward other firms' (in)ability to enter the market. *See, e.g.*, *Reazin v. Blue Cross & Blue Shield of Kansas, Inc.*, 899 F.2d 951, 967-68 (10th Cir. 1990).

Here, the district court assumed that Kolon adequately pled possession of monopoly power. That assumption was correct, given that Kolon pled, among other things, that: numerous barriers to entry into the U.S. para-aramid fiber market exist and supply is low; DuPont has long dominated the U.S. para-aramid fiber market; and DuPont currently controls over 70 percent of that market, i.e.*,* that "DuPont's market share remains greater than 70% of all sales by purchase volume of para-aramid fiber in the United States." [J.A. 559, 748] *See Advanced Health-Care Servs.*, 910 F.2d at 147 ("In its complaints, the plaintiff contends that [defendants] have a dominant share of the [product] markets in their respective relevant geographic areas and that this constitutes monopoly power or a dangerous probability of actual monopolization. These allegations could, if proven, support a finding of monopolization or a dangerous probability of monopolization of the relevant DME markets at stake.").

Further, regarding the relevant market, there is no dispute that the product market is that for para-aramid fibers. And we have already held that the pled geographic market, para-aramid fiber supply to commercial consumers in the United States, was sufficient to withstand DuPont's Rule 12(b)(6) motion.

As to the second element of a monopolization claim, willful maintenance of monopoly power, Kolon's Counterclaim

focuses on DuPont's use of essentially exclusive agreements with key para-aramid fiber purchasers. Although not per se illegal, exclusive dealing arrangements may be an improper means of acquiring or maintaining a monopoly. *See, e.g., Grinnell*, 384 U.S. at 576; *Tampa Electric*, 365 U.S. at 324, 327; *Microsoft*, 253 F.3d at 70-71.

In *Tampa Electric*, the Supreme Court held that an exclusive dealing arrangement does not violate antitrust law unless its probable effect is to "foreclose competition in a substantial share of the line of commerce affected." 365 U.S. at 327. The market share foreclosed is important because, for the contract to adversely affect competition, "the opportunities for other traders to enter into or remain in that market must be significantly limited . . . ." *Id.* at 328. In *Tampa Electric*, the pertinent contract affected less than one percent of the relevant market, which was "quite insubstantial," and did not violate the Clayton or Sherman Acts. *Id.* at 333, 335. "Because an exclusive deal affecting a small fraction of a market clearly cannot have the requisite harmful effect upon competition, the requirement of a significant degree of foreclosure serves a useful screening function" for such antitrust cases. *Microsoft*, 253 F.3d at 69.

In *Microsoft*, the D.C. Circuit indicated that "[a] monopolist's use of exclusive contracts, in certain circumstances, may give rise to a [Sherman Act] § 2 violation even though the contracts foreclose less than [a] roughly 40% or 50% share . . . ." *Id.* at 70. Microsoft had exclusive agreements with fourteen of the top fifteen access providers in North America, ensuring that its browser was offered as the default browser or as the only browser to the majority of internet users in that area. *Id.* at 70-71. The exclusive deals helped maintain Microsoft's monopoly and thus violated Section 2 of the Sherman Act. *Id.*

Here, Kolon alleged that DuPont's use of multi-year exclusive contracts with high-volume para-aramid fiber purchasers

constituted improper anticompetitive conduct. Kolon alleged that DuPont used the contracts "with the highest volume purchasers in the most important commercial sustainable para-aramid categories," committing those valuable customers such as "leading U.S. producers of optic fiber" and "one of the largest U.S. branded tire manufacturers" to buying from DuPont. [J.A. 564] Kolon pled that the contracts "not only limited the overall volume of para-aramid supply available to competition, but has also severely limited Kolon from competition for the most important customers in categories needed to gain a foothold for effective competition to DuPont." [J.A. 564]

Kolon complained that "[b]ecause DuPont's supply contracts severely restricted access to customers and preclude effective competition, DuPont's conduct has had a direct, substantial and adverse effect on competition. And DuPont's anticompetitive conduct has allowed it to control output and increase prices for para-aramid fiber in the United States." [J.A. 565] And "[b]y precluding Kolon from competition for these customers when demand for para-aramid fibers has significantly increased and supply is low, DuPont's conduct has constrained the only potential entrant to the United States in decades from effectively entering the market, reducing if not practically eliminating additional competition, as well as preserving and growing DuPont's monopoly position." [J.A. 565] These allegations are sufficient to withstand a motion to dismiss. *See Advanced Health-Care Servs.*, 910 F.2d at 147 (allegation of a dominant market share coupled with exclusionary conduct sufficient to withstand a motion to dismiss).[12]

---

[12]While Kolon did not allege a specific percentage of market foreclosure in its Counterclaim, it would be problematic to reject its Counterclaim, with its extensive factual allegations, solely on that basis at the pre-discovery, motion-to-dismiss stage, when Kolon likely has insufficient information to calculate a precise number. In contrast, *Microsoft*, 253 F.3d 34, and *Tampa Electric*, 365 U.S. 320, in which foreclosure percentages were determined, were decided after a bench trial and on summary judgment, respectively.

DuPont argues that the agreements it produced to Kolon and which may properly be considered on its motion to dismiss doom Kolon's exclusivity claim. We disagree. As DuPont notes, the agreements required customers to buy somewhat less than all of their para-aramid fiber requirements from DuPont. However, as the district court stated, it may be unrealistic to expect consumers to seek out a mere 15 percent of their requirements for a specialized, integrated product like para-aramid fibers from a second supplier.

Further, despite DuPont's argument to the contrary, the "meet or release" clauses are also restrictive. As the district court indicated, "to win business that DuPont controls by a supply agreement with a 'meet or release' clause, Kolon must make a shot-in-the-dark price offer, hope that the offer beats DuPont's price (which it has no way of knowing) by 2% or more, then hope that DuPont decides not to match Kolon's price. . . . Although these clauses may provide some incremental check on DuPont's ability to raise prices to anticompetitive levels, they pose a formidable hurdle to competing for the customers who have agreed to these deals." [J.A. 756]

DuPont also contends that the purportedly exclusive agreements were not sufficient in duration to prevent Kolon from entering and competing in the market. DuPont points to the fact that none of the four agreements produced had a term of longer than two years. While the four contracts DuPont has thus far produced may well be so limited, Kolon did not plead that all of DuPont's exclusive agreements lasted for only two years or less. Rather, Kolon pled that the exclusive deals were "multi-year." And, as already discussed, relying on DuPont's statement that the four produced contracts are the only agreements relevant to Kolon's Counterclaim is improper. Taking Kolon's allegations as true and making all inferences in its favor, as we must on a motion to dismiss, *see Nemet Chevrolet*, 591 F.3d at 253, DuPont's argument fails.

In sum, Kolon adequately pled all elements of its monopolization claim. We therefore have no basis on which to affirm the district court's dismissal of that claim and reverse.

## C.   Kolon's Attempted Monopolization Claim

Attempted monopolization employs "methods, means and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *M & M Med. Supplies & Servs., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 166 (4th Cir. 1992) (internal quotation marks omitted). To state a claim for attempted monopolization, a claimant must plead: (1) the use of anticompetitive conduct, (2) with specific intent to monopolize, and (3) a dangerous probability of success. *Spectrum Sports*, 506 U.S. at 456; *Advanced Health-Care Servs.*, 910 F.2d at 147.

In this case, we held above that Kolon adequately pled DuPont's use of anticompetitive, exclusive agreements with high-volume para-aramid customers. Kolon has therefore cleared the bar as to the first element—anticompetitive conduct.

As to the second element, specific intent to monopolize, this Court has previously stated that "[s]pecific intent may be inferred from the defendant's anticompetitive practices." *M & M Med. Supplies*, 981 F.2d at 166. We have already held that Kolon adequately pled anticompetitive practices. Further, Kolon alleged various actions undertaken by DuPont over time to protect its dominant market position, including: successfully seeking and obtaining a ban against imports of certain para-aramid fibers into the United States in 1986; "scar[ing] off" others in the industry through trade disputes; and fighting the U.S. International Trade Commission's revocation of antidumping duties on para-aramid fibers. [J.A. 557-59] Kolon has therefore sufficiently pled specific intent to monopolize.

The third and final element of Kolon's attempted monopolization claim is a dangerous probability of success. "In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456. Given that we held above that Kolon adequately pled actual monopolization, we can reach no conclusion other than that Kolon adequately pled a dangerous probability of success as to DuPont's attempted monopolization.

Because Kolon adequately pled all elements of its attempted monopolization claim, we have no basis on which to affirm the district court's dismissal and therefore reverse. *See Advanced Health-Care Servs.*, 910 F.2d 139 (allegation of dominant market share coupled with exclusionary conduct sufficient to withstand motion to dismiss monopolization and attempted monopolization claims).

## V.

In sum, the district court erred both in holding that *Tampa Electric* required the Netherlands and Korea to be included in Kolon's relevant geographic market definition and in considering facts beyond the pleadings and construing them against Kolon to dismiss Kolon's Counterclaim. Because Kolon plausibly pled monopolization and attempted monopolization in violation of Section 2 of the Sherman Act, we reverse.

*REVERSED*